David K. Isom #4773
ISOM LAW FIRM PLLC
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 209-7400
Email: david@isomlawfirm.com
*Attorney for Plaintiff J. Hoyt Stephenson*

---

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| J. Hoyt Stephenson, <br><br> Plaintiff, <br><br> v. <br><br> Leland S. McCullough and Thomas Richard Davis <br><br> Defendants. | COMPLAINT AND JURY DEMAND <br><br><br> Case No. 2:16-cv-1033 <br><br> Magistrate Judge Brooke C. Wells |

Plaintiff J. Hoyt Stephenson alleges as follows:

### PARTIES, VENUE AND JURISDICTION

1.      This Court has diversity jurisdiction of this action pursuant to 28 U.S.C. § 1332

because all of the defendants are citizens of a state other than that of Stephenson and

the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2) because

one or more defendants reside in this District and a substantial part of the events or

omissions alleged below occurred in this District.

3.      Stephenson is a citizen of Wyoming.

4.      Defendant Leland S. McCullough ("McCullough") is a citizen of Utah.

5.      Defendant Thomas Richard Davis ("Davis") is a citizen of Utah.

6.      At all relevant times, McCullough and Davis were lawyers authorized to practice, and practicing, law in Utah.

7.      During most or all of the relevant time, McCullough was a shareholder, director and chairman of the law firm of Callister, Nebeker & McCullough ("Callister").

8.      McCullough had a duty to supervise other Callister lawyers in their performance of services for Stephenson, including Callister lawyer David York ("York") who billed more time to the Stephenson representation than any other Callister lawyer and committed torts and breaches against Stephenson, and W. Waldan Lloyd ("Lloyd"), who committed grievous torts and breaches against Stephenson as detailed below.

9.      McCullough was the Callister lawyer principally responsible for the representation of Stephenson.  McCullough is responsible for the breaches and torts of York and Lloyd alleged below.

10.     During most or all of the time relevant to Davis' involvement in these matters, Davis was a shareholder, director and president of Callister.

11.     Davis and McCullough were responsible for Callister's acts, and committed the torts specified below, in connection with Callister's conduct of the Callister Malpractice Action specified below.

**OVERVIEW**

12.     This is an action for legal malpractice against two of the lawyers who represented, and whose law firm represented, Stephenson for years as his attorneys at law, but who

wrongfully and frivolously deny that they and their law firm ever represented Stephenson and deny that Stephenson was ever their client.

13.     This action asserts claims for breach of fiduciary duty, negligence and breach of the standard of care, outrageous conduct and intentional infliction of emotional distress, and interference with economic relations.

14.     The defendants have proximately caused Stephenson to sustain devastating losses and injuries.

15.     Defendants' acts and omissions manifest a knowing, malicious and reckless disregard for the rights of others, and Stephenson has the right to recover exemplary and punitive damages.

16.     Stephenson did not learn that the defendants had caused the injuries alleged in this action until these facts were revealed during discovery in 2015 and 2016 in the legal malpractice action by Stephenson against Callister currently pending in the Third District Court in Salt Lake City, Utah ("Callister Malpractice Action").

## GENERAL ALLEGATIONS

### The 2002-03 Engagement Agreements

17.     As of 2002, Stephenson had developed and was the sole shareholder of two corporations, National Financial Systems, Inc. ("NFS") and Metronomics, Inc. ("Metro") (jointly "Stephenson Companies") that had developed the successful business of providing financial, membership, accounting and related services to over a thousand fitness and health clubs in the United States.

18.     The Stephenson Companies had elected Subchapter S status for tax purposes, which meant that the Stephenson Companies did not pay taxes, and that the tax treatment of Stephenson Companies' revenues and income flowed through

3

directly to Stephenson personally.

19.     In late 2002, McCullough caused York to approach Stephenson and solicit Stephenson to become a client of McCullough, York and Callister and for Callister, York and McCullough to become Stephenson's lawyers.

20.     McCullough represented to Stephenson through York that McCullough and Callister had spent considerable time representing other individuals developing and researching a legal and tax strategy (the "Callister Strategy") that would optimize Stephenson's personal tax position, minimize his federal income tax, and allow him to use tax-deferred income to continue to build the Stephenson Companies.

21.     In December 2002, McCullough, Callister and Stephenson entered into a written engagement agreement pursuant to which McCullough and Callister agreed to provide legal advice, legal structuring, creation of legal entities, legal documentation and ongoing and long-term legal assistance aimed at implementing the Callister Strategy ("2002 Agreement").

22.     The 2002 Agreement also promised that McCullough and Callister would create a management and co-employment company that Callister and Stephenson named National Financial Systems Management, Inc. ("Management") and that McCullough and Callister would "make sure" that Management would meet the business purpose test in order to achieve the touted tax benefits.

23.     The Callister Strategy also included the creation of an Employee Stock Ownership Plan ("ESOP") that owned all of the stock of Management as part of the effort to optimize Stephenson's tax position.

24.     McCullough and Callister by the 2002 Agreement also promised to draft and structure management agreements ("Management Agreements") between the

Stephenson Companies and Management so as to assure that Management obtained the minimal net revenue and company valuation to satisfy the tax goals of the Callister Strategy while at the same time maximizing the net revenue to Stephenson personally that could be tax-deferred.

25.     The Management Agreements limited profit to Management to $7,500 as an annual management fee. This $7,500 annual management fee was a combination of $3,750 for NFS and $3,750 for Metro.

26.     By the 2002 Agreement, Callister and McCullough also expressly promised that the Management Agreements would justify the leasing management arrangements.

27.     Other services that McCullough and Callister expressly promised to provide pursuant to the 2002 Agreement included: (1) obtaining necessary approvals and a determination letter from the IRS with respect to the ESOP; (2) rendering a written legal opinion regarding the legality of the Callister Strategy; and (3) working with Stephenson and his accountant to make sure the Callister Strategy was properly set up and functioning.

28.     The 2002 Agreement also provided that McCullough and Callister would provide additional legal services not specified in the agreement for which additional fees would be paid as those additional services were provided pursuant to the 2002 Agreement.

29.     By the 2002 Agreement, McCullough and Callister also agreed to draft, advise about and establish a deferred compensation plan to benefit Stephenson and possibly other key employees.  The deferred compensation plan was set up to benefit Stephenson, and although it contemplated benefiting other key employees,

Stephenson was the only participant. The primary purpose of the deferred compensation plan was to achieve the personal tax benefits for Stephenson and his companies that were the main reason for adopting the Callister Strategy.

30.    The deferred compensation plan provided that Stephenson was a participant in the plan, and that other key employees might qualify to participate in the deferred compensation plan.

31.    Pursuant to the 2002 Agreement, McCullough and Callister also represented the Subchapter S Stephenson Companies.  Because the Callister Strategy included optimizing Stephenson's tax position with respect to the Subchapter S flow-through income of the Stephenson Companies, McCullough and Callister also represented the Stephenson Companies as a matter of law while Stephenson was the sole owner of those companies.

32.    By an additional written contract between Callister and Stephenson dated March 21, 2003 ("2003 Agreement"), Callister agreed to provide additional legal services to Stephenson as Callister's client.  The 2002 Agreement and the 2003 Agreement are referred to jointly below as the "2002-03 Attorney-Client Agreements."

33.    The services provided to Stephenson pursuant to the 2002-03 Attorney-Client Agreements expanded over the next eight years because the implementation of the Callister Strategy required ongoing legal structuring, agreements and advice and annual reporting; because of changes in the law; because many of the promised steps in implementing the Callister Strategy took longer than anticipated, and because of the need to try to correct mistakes and errors that McCullough and Callister committed in representing Stephenson.

### The 3-Options Letter

34.    On July 21, 2003, the IRS issued temporary and proposed regulations ("IRS Regulations") that, once effective, destroyed or curtailed the essential tax benefits to Stephenson underlying the Callister Strategy.  These IRS Regulations provided a grace period to allow taxpayers to adjust by taking action by July 21, 2004.

35.    McCullough had a duty to notify Stephenson promptly of these regulations and to advise Stephenson about the impact of the regulations and the available solutions, if any.

36.    McCullough failed to do so.

37.    On January 15, 2004, McCullough sent a letter to Stephenson outlining three options for reacting to the IRS Regulations ("3-Options Letter").

38.    McCullough sent a similar letter to numerous other McCullough and Callister clients that had adopted agreements, entities and business and personal devices and structures similar to the Callister Strategy that McCullough and Callister had created and were creating for Stephenson and the Stephenson Companies.

39.    This letter notified Stephenson and other individual Callister and McCullough clients that the IRS Regulations, unless later amended, would limit the amount of compensation that could be tax-deferred after July 21, 2004.

40.    Though the advice as to the options for responding to the IRS Regulations was critical, and though McCullough claimed to have given such advice prior to the 3-Options Letter, and though McCullough promised additional advice, McCullough failed to provide any legal advice to Stephenson about these options either before or after he sent the 3-Options letter.   Instead, the 3-Options Letter was a form letter developed for other Callister Clients that McCullough sent to Stephenson without any individual attention and

without providing any follow-up or advice specific to Stephenson.

41.     The three options outlined in the 3-Options Letter were: (1) pay out all deferred compensation; (2) sell the stock of Management for its fair market appraised value, terminate the Management Agreements, distribute proceeds of the sale to the ESOP participants and terminate the ESOP; or (3) continue with the previously-advised management structure and deferred compensation plan in the hope that the IRS Regulations would be changed to allow the hoped-for tax benefits.

42.     McCullough owed a duty to Stephenson to provide competent advice directly about the three options, or to supervise York properly to assure that York provided competent advice.

43.     McCullough breached this duty.

44.     The IRS Regulations fundamentally undercut the legality and utility of the Callister Strategy.

45.     Because McCullough and Callister failed to provide any detailed advice, Stephenson chose option 3.

46.     McCullough and Callister provided individual advice to the other Callister Strategy clients, most or all of whom chose option 2.

47.      Most or all of the major actions that McCullough and Callister advised Stephenson to take that are detailed below were the result of the failure of McCullough and Callister to provide competent advice about the three options outlined, and would not have occurred or been necessary had McCullough and Callister provided competent advice about the three options.

48.     The January 15, 2004 letter to Stephenson advised that, unless the IRS Regulations were changed, Stephenson should adopt one of three options

8

recommended in the letter.

49.     McCullough and Callister failed to provide competent advice to Stephenson as to how to proceed in light of the broken Callister Strategy and the IRS Regulations.

### Additional 2004 Failures

50.     In June 2004, George Ulrich ("Ulrich"), an accountant for Stephenson, the Stephenson Companies and Management, sent an email and spreadsheet to York and Callister that plainly showed that Ulrich was planning to implement the Callister Strategy in a way that was materially contrary to the goals of the Callister Strategy and contrary to Stephenson's interests.

51.     Though McCullough and Callister had promised in the 2002 Agreement to work with Stephenson and his accountant to assure that the Callister Strategy was implemented correctly, McCullough and York failed to analyze the data, information and questions that Ulrich sent in June 2004.

52.     This information put McCullough, York, Lloyd and Callister on reasonable notice that Ulrich was fundamentally misapplying the Callister Strategy in a way that reasonably and foreseeably could, and in fact did, damage Stephenson in the amount of millions of dollars.

53.     McCullough and York failed to alert either Ulrich or Stephenson that Ulrich was fundamentally misapplying the Management Agreements and the Callister Strategy.

54.     Instead, without analyzing them, York forwarded the June 2004 email and spreadsheet to Lloyd who also failed to advise Stephenson of Ulrich's fundamental errors.

55.     These errors resulted in accounting that erroneously over-valued Management and under-represented the amount and value of Stephenson's deferred compensation

that were in fact required by the Management Agreements and deferred compensation plan.

56.     As a result, Ulrich incorrectly transferred the profits of the Stephenson Companies to NFSM beyond what was authorized by the Cost-Plus Management  Agreement and recorded them as revenue belonging to NFSM, instead of recording them as  payables or liabilities owed to NFS or Metro on NFSM's books or without recording them as Stephenson's NFSM deferred compensation.

57.     Thus, all assets and revenue recorded on the  books and records of Management for 2003 – 2007 above Management's actual reimbursable costs incurred in performing the Management Agreements plus the $7,500 per year management fee were owed by Management to Stephenson or  to the Stephenson Companies.

58.     Such assets and money which constituted overpayments by the Stephenson Companies to Management for the years 2003 through 2007 totaled over $5 million.

59.     Stephenson was not aware of this communication, or of Ulrich's mistake, or the details of the Callister Strategy, or of the mistakes that McCullough, York, Lloyd and Callister had made until years later.

### Representation of Management

60.     In the course of representing Stephenson and the Stephenson Companies, McCullough and Callister also came to represent Management as Management's attorneys, though no written engagement agreement for the representation of Management was ever proposed, discussed or executed.

61.     McCullough and Callister failed to disclose to Stephenson the substantial risk and  legal impact of their representation of Management upon their representation and ability to represent Stephenson and the Stephenson Companies.

62.    McCullough and Callister failed to advise Stephenson of the implications of the actual and potential conflicts of interest as between Management and Stephenson.

63.    McCullough and Callister failed to seek or obtain from Stephenson his informed consent to the joint representation of Management, Stephenson and the Stephenson Companies.

64.    McCullough and Callister failed to seek or obtain from Stephenson a written, express waiver of their conflicting representation of Management, Stephenson and the Stephenson Companies.

65.    NFSM and the ESOP and these other entities and persons later became legal  adversaries to Stephenson and filed lawsuits against Stephenson related to the  subject  matter,   facts  and  issues  involved  in  the  Callister  Defendants' representation of Stephenson and the  Stephenson Companies.

**The 2007-2008 Agreements**

66.    In 2007, York and Callister recommended that Stephenson sell the Stephenson Companies to Management, by the agreements set forth in this section, and Stephenson followed this advice.

67.    This advice was motivated at least in part to address the disruption to the Callister Strategy created by the IRS Regulations, and by McCullough's, York's and Callister's failure to provide competent advice to Stephenson regarding options to address those regulations.

68.    York and other Callister attorneys under McCullough's direction drafted and provided legal advice to Management, Stephenson and the Stephenson Companies concerning a stock purchase agreement effective October 15, 2007 ("2007 Agreement") pursuant to which Stephenson sold the stock of NFS to Management.

69.    Management promised to pay Stephenson $2,900,000 for the stock within one year of the purchase date.

70.    York and other Callister attorneys under McCullough's direction drafted and provided legal advice to Management and to Stephenson concerning a stock purchase agreement effective January 15, 2008 ("2008 Agreement") pursuant to which Stephenson sold the stock of Metro to Management and Management promised to pay to Stephenson $10,310,000 for the Metro stock within one year of the purchase date.

71.    Thus, pursuant to the 2007 Agreement and the 2008 Agreement (jointly "2007-08 Agreements"), Management agreed to pay to Stephenson a combined $13,210,000 by January 15, 2009.

72.    Ulrich provided the basic financial terms of the 2007-08 Agreements to Callister, but all of the legal terms and structure of the 2007-08 Agreements were created and drafted by Callister.

73.    York and other Callister attorneys under McCullough's direction advised Stephenson that it was legal for Stephenson to enter into the 2007-08 Agreements, and recommended to Stephenson that Stephenson enter into those agreements with Management.

74.    This advice was incompetent, and would not have been given had McCullough, York, Lloyd or other Callister attorneys understood, analyzed and properly advised Stephenson about the financial information stated above that York, Lloyd and Callister had received from Ulrich in June 2004.

75.    McCullough, York and Lloyd owed the following duties, among others, in representing Stephenson in connection with the 2007-08 Agreements: (1) to explain to Stephenson the conflicts and potential conflicts of interest that existed between

Stephenson, the Stephenson Companies and Management in relation to the 2007-08 Agreements; (2) to inform Stephenson of the potential risks of the transactions, including the risks of being represented by the same counsel as was representing Management; (3) either to refrain from representing Management in connection with the 2007-08 Agreements or to advise Stephenson to seek independent counsel as to whether Stephenson should agree to allow McCullough, York, Lloyd and Callister to represent Management in connection with those transactions; and (4) not to undertake the representation without a written, informed waiver by Stephenson of the conflicts inherent in the dual and conflicting representation.

76.     Because of these failures, Stephenson did not understand these risks.

77.     Stephenson would not have proceeded with the 2007-08 Agreements in reliance upon the advice of York, McCullough and Callister had he understood these rights and risks.

**2008 Representation of Hall**

78.     The last payment under the 2007-08 Agreements was due to be paid under the terms of those agreements by October 15, 2009.

79.     In 2008, a third party, Bailey Hall ("Hall"), expressed interest to Ulrich in purchasing from Stephenson or Management interests and assets involved in the 2007-08 Agreements ("Potential 2008 Hall Transaction").

80.     Stephenson gave his permission to Ulrich for Ulrich and Hall to talk to York and Callister about possible terms of the Potential 2008 Hall Transaction.

81.     Without Stephenson's knowledge, permission or informed consent, however, McCullough, York and Callister entered into a contract to represent, and in fact represented, Hall with respect to the Potential 2008 Hall Transaction.

82.     Though the Potential 2008 Hall Transaction was not consummated, Hall learned crucial, confidential, proprietary and privileged information from York and Callister in their wrongful concurrent and multiple representation of Stephenson, the Stephenson Companies, Management and Hall in connection with that transaction.

83.     This harm became catastrophic when, in 2009, still without the knowledge that York and Callister had represented Hall in the Potential 2008 Hall Transaction, Stephenson entered into the 2009 Agreement described below.

84.     York's and Callister's secret representation of Hall in 2008 and their revelation to Hall of Stephenson's privileged, proprietary and confidential information gave Hall an unfair advantage in negotiating the terms of the 2009 Agreement.

**2009 Agreement**

85.     After Management defaulted upon payments due under the 2007-08 Agreements, Hall, Management, the ESOP, the Stephenson Companies and Stephenson entered into the 2009 Agreement dated June 30, 2009 that effected the following transactions, among others:  (1) Management acknowledged its defaults to Stephenson in making payments to Stephenson for the purchase of the stock of the Stephenson Companies under the 2007-08 Agreements; (2)  Management re-conveyed the stock of the Stephenson back to Stephenson; and (3) Stephenson sold the stock of the Stephenson Companies and other assets to Hall for which Hall promised to pay to Stephenson $10.5 million for the stock of the Stephenson Companies plus specified amounts for other assets.

**2010 Lloyd Letter**

86.     Hall refused to pay to Stephenson the amounts due when due under the 2009 Agreement.

87.     In late 2009, Hall was in the process of obtaining financial audits of companies including Management, NFS and Metro

88.     As part of the audit, the auditors questioned the validity of the original Callister Strategy and subsequent transactions involving NFS, Metro and Management, including the 2007–08 Agreements.

89.      Ulrich forwarded the auditors' questions to Callister. Callister responded to the auditors' questions.

90.     After the initial response to the auditors, Lloyd and Callister insisted on drafting a separate letter to Ulrich, in which Callister sought to cover its wrongful actions in conjunction with the representation of Stephenson and the Stephenson Companies, including the 2007–08 Agreements.

91.     Callister also sought to shift the blame of these negligent actions from itself to Stephenson.

92.     Lloyd and Callister wrote and provided to Ulrich a letter dated February 24, 2010 (the "Lloyd Letter") opining that by entering into the 2007-08 Agreements and subsequent 2009 Agreement, Stephenson had committed numerous crimes and breaches of statutory, contractual and other civil wrongs, including breaches of duties under ERISA.

93.     The information contained in the letter has caused catastrophic and irreparable harm to Stephenson.

94.     When Lloyd wrote and provided the Lloyd letter, he knew or should have known that the Lloyd Letter was not privileged, and that the Lloyd Letter would be provided to auditors, accountants and other third parties.

95.     When Lloyd wrote and sent the Lloyd Letter to Ulrich, Davis was president and

a director of Callister and McCullough was chairman of the board and a director of Callister.   Moreover, McCullough was responsible for Callister's representation of Stephenson.

96.    When Davis and McCullough learned of the Lloyd Letter, they had duties to take reasonable steps to mitigate the damage caused by the Lloyd Letter.

97.    Davis and McCullough failed to take the steps that they had a duty to take to mitigate the harm of the Lloyd Letter, including disciplining Lloyd for failing to follow reasonable protocols to prevent the reckless allegations that Lloyd made against Stephenson.

98.    All material allegations of legal wrongdoing by Stephenson in the Lloyd Letter were either false or done at the direction of McCullough, York, Lloyd and Callister, and Davis and McCullough had a duty to investigate and reasonably should have known that the allegations were false.

99.    The Lloyd Letter accused Stephenson of gross wrongdoing for entering into the 2007-08 Agreements that Callister had drafted and advised Stephenson to enter.

100.    McCullough was directly responsible for the work of Callister in relation to Stephenson, and had a duty to supervise Lloyd and to prevent Lloyd from writing the Lloyd Letter.

101.    When Lloyd wrote the Lloyd Letter, Stephenson was still a client of Callister, and Stephenson reasonably believed that he was a client of Callister.

102.    Stephenson did not learn that Lloyd and Callister had written and sent the Lloyd Letter until Hall presented the Lloyd Letter to Stephenson in the autumn of 2010 along with the threat that the Lloyd Letter was Hall's "nuclear option" that Hall would use to prevent Stephenson from collecting monies under the 2009 Agreement.

103.    Before Lloyd and Callister wrote and sent the Lloyd Letter, Lloyd and Callister had a duty to inform their client Stephenson of their intent to send the letter, and a duty not to write or send the letter without Stephenson's informed, written consent.

104.    Ulrich has testified that he did not request Lloyd or Callister to write the Lloyd Letter, but only requested they respond to the auditors' questions – which they did. Ulrich has testified Lloyd insisted on drafting a separate letter (which became the Lloyd Letter).

105.    Lloyd and Callister knew that Stephenson would not give consent to draft and issue the letter, and that the Lloyd Letter would severely harm their client Stephenson.

### Davis County Action

106.    When Hall refused to pay the amounts required by the 2009 Agreement, Stephenson brought an action in September 2010 in the Second District Court in Davis County, Utah to collect the amounts owed and for other remedies provided by the 2009 Agreement ("Davis County Action").

107.    Management intervened in the Davis County action and filed claims against Stephenson, including claims that Stephenson breached various legal duties and fiduciary obligations to Management by entering into the 2007-08 Agreements.

108.    Management has obtained a judgment in the Davis County Action holding that Stephenson breached fiduciary and other duties to Management by entering into the 2007-08 Agreements that McCullough, York and Callister had drafted and advised Stephenson were legal transactions as to which Stephenson had the right to enter without breaching any fiduciary or other duties.

109.    Management's claims and the above judgment have seriously delayed and impeded Stephenson's ability to obtain a judgment against Hall.

### McCullough's and Davis' Wrongful Conduct Regarding the Callister Malpractice Action

110.   In 2014, Stephenson filed a civil action alleging legal malpractice against Callister and Lloyd in the Callister Malpractice Action.

111.   Stephenson did not file an action against McCullough because at the time Stephenson did not know of McCullough's responsibility and pervasive involvement in the matters alleged here.

112.   During Callister's representation of Stephenson, Stephenson only met McCullough once, and then only in passing in the hall of the law firm.

113.   Though McCullough signed the 2002 Agreement and the 3-Options Letter, Stephenson believed that York was the responsible attorney.

114.   In the Callister Malpractice Action, discovery showed that McCullough was the attorney responsible for Callister's representation of Stephenson.

115.   Stephenson has learned the following from documents produced and from testimony in the Callister Malpractice Action, and from Callister's conduct of the litigation.

116.   In 2011, Management requested from Callister documents as to which Stephenson owned an attorney-client privilege, without seeking or obtaining Stephenson's waiver or consent to produce those documents to Management.

117.   At the direction and with the knowledge and consent of Davis and McCullough, Callister produced those documents to Management.

118.   From and after 2011, Stephenson has subpoenaed and requested documents from Callister that Stephenson had the right to receive from Callister, and that Callister had the legal obligation to produce to Stephenson.

119.   Davis and Callister refused to produce some documents to Stephenson based upon the assertion of privilege by Management.

120.   Some of those documents have now been produced, but Callister and Davis still refuse to produce some of these documents to Stephenson.

121.   In 2011, Davis investigated Callister's and McCullough's involvement in these matters.

122.   This investigation included interviews with Callister attorneys, including Lloyd and York, and written reports about these matters from Lloyd and York.

123.   York informed Davis that Stephenson was the firm's client for the above attorney services.

124.   Despite this information from York, Davis has testified in the Callister Malpractice Action that his investigation revealed that Stephenson was not a client of Callister.

125.   This testimony was material and knowingly and intentionally false.

126.   Defendants' acts have delayed the Callister Malpractice Action, increased the cost and expense of litigating the Callister Malpractice Action, and caused other damage to Stephenson.

## FIRST CLAIM FOR RELIEF
### (Legal Malpractice - Breach of Fiduciary Duty - McCullough)

127.   Stephenson incorporates the above allegations.

128.   As Stephenson's attorney, McCullough owed fiduciary duties to Stephenson, including duties of loyalty, competence, confidentiality and independent judgment.

129.   McCullough breached his fiduciary duties to Stephenson.

130.   McCullough's breaches of fiduciary duty proximately injured Stephenson,

including monetary losses exceeding $10,000,000 in an amount to be proven at trial.

131.    McCullough's actions were and are the result of intentional and malicious conduct or conduct that manifests a knowing and reckless disregard of and indifference toward the rights of others, entitling Stephenson to punitive or exemplary damages pursuant to Utah Code Ann. 78B-8-201, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Legal Malpractice—Standard of Care—Negligence—McCullough)

132.    Stephenson incorporates by this reference all paragraphs above.

133.    McCullough owed to Stephenson the duty of competence and care applicable to all Utah attorneys.

134.    These duties included the duty to protect the interests of Stephenson, and the duty to exercise the same degree of care, skill, judgment and diligence used by reasonably prudent attorneys under similar circumstances.

135.    These duties also included other duties imposed upon McCullough by the Utah Rules of Professional Conduct.

136.    McCullough had a duty not to represent other persons with interests adverse to those of Stephenson with respect to matters substantially related to his representation of Stephenson without obtaining a written waiver from Stephenson of such conflicts of interest.

137.    In addition, McCullough breached the duty of care that he owed to Stephenson by failing to properly design and implement the Callister Strategy to achieve its intended purposes.

138.    McCullough breached his duties to: (1) supervise properly other attorneys who performed services for Stephenson; (2) to provide the written legal opinions that he

promised to provide; and (3) to counsel and advise Stephenson and his accountant properly with respect to the implementation of the Callister Strategy.

139.    The acts and failures to act described herein constitute a failure to use the same degree of care, skill, judgment and diligence used by reasonably prudent attorneys under similar  circumstances.

140.    McCullough's acts and failures to act were the proximate cause of injury and harm to Stephenson, including monetary losses in an amount exceeding $10,000,000 to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Intentional Interference with Existing and Future Economic and Contractual Relationships—McCullough)

141.    Stephenson incorporates the paragraphs above.

142.    McCullough intentionally interfered with Stephenson's existing and future economic and contractual relationships by improper means and for an improper purpose.

143.    McCullough's acts and failures to act described above were the proximate cause of injury and harm to  Stephenson, including monetary losses in an amount exceeding $10,000,000 to be proven at trial.

144.    McCullough's actions were the result of  intentional and malicious conduct or conduct that manifests a knowing and reckless disregard  of and indifference toward the rights of others, entitling Stephenson to punitive or exemplary  damages pursuant to Utah Code Ann. 78B-8-201, in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### (Outrageous Conduct – McCullough and Davis)

145.    Stephenson incorporates the above paragraphs.

146.   Defendants intentionally engaged in conduct toward Stephenson  either with the purpose of inflicting emotional distress or under conditions where a reasonable  person would have known that Defendants' conduct would cause such emotional distress.

147.   Defendants proximately caused Stephenson to suffer severe  emotional distress and other damage in an amount to be proven at trial.

148.   Defendants' conduct was of such a nature as to be considered  outrageous and intolerable in that they offend generally accepted standards of decency and  morality. Moreover, the Callister Defendants' actions were (and are) the result of intentional and malicious conduct or conduct that manifests a knowing and reckless disregard of and  indifference  toward  the  rights  of  others,  entitling  Stephenson  to  punitive  or exemplary  damages  pursuant  to  Utah  Code  Ann.  78B-8-201,  in  an  amount  to  be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Stephenson prays for judgment as follows:

A.     Under Stephenson's First Claim for Relief, for general, special, consequential and exemplary damages against McCullough in an amount to be determined at trial;

B.     Under  Stephenson's  Second  Claim  for  Relief,  for  general,  special  and consequential damages in an amount to be determined at trial;

C.     Under Stephenson's Third Claim for Relief, for general, special, consequential and  exemplary damages against McCullough in an amount to be determined at trial;

D.     Under Stephenson's Fourth Claim for Relief, for general, special, consequential and exemplary damages in an amount  to be determined at trial.

E.     For interest, attorney fees and such other relief as the Court deems just and appropriate.

## JURY REQUEST

Stephenson requests a trial to a jury of all issues triable to a jury.


Date:  October 4, 2016.

ISOM LAW FIRM

/s/ David K. Isom
_____
David K. Isom #4773

Attorney for Plaintiff
J. Hoyt Stephenson

Plaintiff's Address:

J. Hoyt Stephenson
8433 State Highway 150 South
Evanston, Wyoming 82930